# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: SA CR 15-0019-DOC |
| vs. | |
| JAMES WILLIAM THURMAN TANNER, | ORDER DENYING DEFENDANT'S MOTION FOR ACQUITTAL, FINDING DEFENDANT GUILTY OF COUNTS 1, 2, AND 3 |
| Defendant. | |

**I. INTRODUCTION**

Following a bench trial in this matter, the Court issues the following findings of fact and conclusions of law. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law. Based on its findings and conclusions, the Court DENIES Defendant's Motion for Acquittal and finds Defendant GUILTY of Counts 1, 2, and 3.

**II. BACKGROUND**

1. On February 25, 2015, a grand jury returned a four count indictment charging defendant James William Thurman Tanner ("Thurman") with violations of (1) 18 U.S.C. § 2422(b) – Use of Facility of Interstate Commerce to Attempt to Induce a Minor to Engage in Criminal Sexual Activity (Count One); (2) 18 U.S.C. §§ 2252A(a)(2), (b)(1) – Distribution and Receipt of Child Pornography (Counts Two and Three); and (3) 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2) – Possession of Child Pornography (Count Four). *See* Indictment (Dkt. 9).

2. Defendant pleaded guilty to Count Four of the Indictment. Minutes, Change of Plea Hearing, April 3, 2017 (Dkt. 42).

3. Following the conclusion of a two-day bench trial on this matter, Defendant orally moved to dismiss Counts Two and Three pursuant to Federal Rule of Criminal Procedure 29 based on the government's alleged failure to establish venue in the Central District of California.

**III. FINDINGS OF FACT**

**Jwatt92801@gmail.com Email Account**

4. In June 2014, Agent Timothy Kirkham of Immigration and Customs Enforcement, Homeland Security Investigations, Los Angeles, and the Orange County Child Exploitation Task Force, received a tip from the Department of Homeland Security in Florida. Trial Tr. Day 1, Vol. I (Dkt. 85) at 35–36.

5. The tip concerned two emails: one email sent by and one email received by jwatt92801@gmail.com. Both emails contained images of child pornography. *Id.* at 35:24–37:16. *See also* Gov't Tr. Exs. 28, 29.

6. The tip also included the subscriber information for jwatt92801@gmail.com, which indicated that the owner of the account was "James Thurman." Trial Tr. Day 1, Vol. I at 35:24–16.

7. The first email, dated December 14, 2012 at 11:50 a.m., was sent from jwatt92801@gmail.com to rickyt111222@hotmail.com and was entitled "Pics for You." This email contained sixteen images of child pornography. *Id.* at 50:23–51:12, 53:18–56:3; Tr. Exs. 7–22, 28.

8. The second email, dated December 14, 2012 at 2:59 p.m., was sent from rickyt111222@hotmail.com to jwatt92801@gmail.com. This email contained six images of child pornography. Trial Tr. Day 1, Vol. I at 38:15–41:14; Tr. Exs. 1–6, 29.

9. Upon receiving the tip and these two emails, Agent Kirkham began an investigation into the person behind jwatt92801@gmail.com. As part of the investigation, Agent Kirkham served a search warrant on Google to obtain the content and subscriber information of jwatt92801@gmail.com. Trial Tr. Day 1, Vol. I at 37:10–14, 46.

10. After receiving Google's production in response to the warrant, Agent Kirkham determined that jwatt92801@gmail.com was created and owned by the defendant, Mr. Thurman. *Id.* at 48:1.

11. Only one of the two emails described above was in the Google production: the email from jwatt92801@gmail.com to rickyt111222@hotmail.com. The email from rickyt111222@hotmail.com to jwatt92801@gmail.com was not in the Google production. Trial Tr. Day 1, Vol. II (Dkt. 82) at 50:13–21.

12. Google did not produce emails that had been deleted from the jwatt92801@gmail.com account. *Id.* at 82:10–17. Thus, it is likely that the email from rickyt111222@hotmail.com to jwatt92801@gmail.com was deleted at some point after it was received.

13. The Google production did not include internet protocol ("IP") logs from 2012, the year in which the two emails were sent. *Id.* at 152–153. Thus, Agent Kirkham was not able to subpoena the electronic device that was used to send and receive emails from the jwatt92801@gmail.com account on December 14, 2012, and did not know the location from which the account was accessed on that date. *Id.* at 80:4–21.

14. No emails were exchanged between jwatt92801@gmail.com and rickyt111222@hotmail.com in 2013 or 2014. Trial Tr. Day 1, Vol. II at 114. There is no evidence in the record of any other emails between these two accounts.

15. During Mr. Thurman's post-arrest interview, he stated that he did not willingly give others access to his phone. Gov't Ex. A. at 9. He also admitted that he created and was the owner of the jwatt92801@gmail.com account. *Id.*

16. However, Mr. Thurman also stated that he was not sure whether or not someone else had ever accessed his Gmail account through his phone, because his phone had been stolen several times in the last several years. *Id.* at 9–10. Mr. Thurman stated that when his phone is stolen, he sometimes does not sign out of his Gmail account, which is accessible through his phone. *Id.* at 10.

17. Mr. Thurman stated that he deletes any emails that are not intended for him or that he does not want to keep. *Id.* at 11.

**Search of Ex-Girlfriend's House**

18. As part of his investigation, Agent Kirkham ran a CLEAR report, and a search warrant was served at the most recent address listed in the report—the home where Mr. Thurman once lived with his ex-girlfriend, Ashley Weber. Trial Tr. Day 1, Vol. I at 45:17–18; Trial Tr. Day 1, Vol. II at 12:8–13, 12:25–13:3, 63:20–25.

19. No evidence of child pornography was found at this address. Trial Tr. Day 1, Vol. II at 64:1–10.

**Conversations with Gjewel2**

20. On January 28, 2015, Agent Kirkham found Mr. Thurman's account on the social media website Mocospace and created an undercover account with the username "gjewels2."

1    *Id.* at 16:1–17. The profile listed gjewels2 as a nineteen-year-old living in Altadena,
2    California. *Id.* at 17: 9–10.
3    21. Every time that Agent Kirkham used the gjewels2 profile to view Mr. Thurman's
         profile, Mocospace sent Mr. Thurman a notification that gjewels2 wanted to talk to him.
         *Id.* at 101.
4    22. Mr. Thurman began chatting with gjewels2 on Mocospace on January 28, 2015. *Id.* at
         27:14–15.
5    23. Gjewels2 told Mr. Thurman that "she" was actually fourteen years old. *Id.* at 27:20.
6    24. Mr. Thurman asked gjewels2 to meet him in Fullerton on Saturday, January 31, 2015,
         and gjewels2 agreed. Tr. Ex. 25 at 2; *id.* at 49:4–6.
7    25. Mr. Thurman told gjewels2 that he would like to "play" "sex ed 101." Tr. Ex. 25 at 3.
8    26. Mr. Thurman told gjewels2 that it would not hurt to have sexual intercourse, and that he
         had "plan[ned] this for a long time." *Id.* at 4.
9    27. After gjewels2 asked Mr. Thurman what he would do to make sure that sexual
         intercourse would not hurt, he described in graphic detail how he would sexually satisfy
         gjewels2 and how he would teach her how to "give a male a blow job." Tr. Ex. 25 at 16.
10   28. During their conversation on Mocospace, gjewels2 made numerous comments about her
         age, including:
         a. Stating that she lived with her parents and would remain living with them until she
            turned eighteen (*Id.* at 2);
         b. Stating that she was still in school (*Id.* at 9);
         c. Stating that she had a friend that was also fourteen years old (*Id.* at 13); and
         d. Stating that she had temporarily stopped chatting with Mr. Thurman because she
            "got a bit scared being 14 and you 29" (*Id.* at 8).
         In response to the last statement, Mr. Thurman replied "i know. i understand." *Id.*
11   29. During the Mocospace chat, Mr. Thurman also offered to provide gjewels2 with
         cigarettes and alcohol, stating that the items "are to make you feel more adult by the
         way." *Id.* at 13.

30. After making plans to meet, Mr. Thurman asked gejewels2 to do him a "favor" and "not tell anyone that you had sex with me." Gjewels2 asked if Mr. Thurman was "worried about getting in trouble," and Mr. Thurman responded "yes. I could get sent to prison for this." He also stated that "i hope i don't get in trouble." *Id.* at 12, 13, 28.

31. Mr. Thurman and gjewels2 agreed to meet at a Starbucks coffee shop located on the corner of Harbor Boulevard and West Orangethrope Avenue in Fullerton, California on Saturday January 31, 2015. *Id.* at 14, 16.

32. Mr. Thurman informed gjewels2 that he had rented room 208 at the Fullerton Lodge, and advised her to "be sneaky ok." *Id.* at 31.

33. The night before the planned meeting, Mr. Thurman paid to stay at the Fullerton Lodge for one night. Trial Tr. Day 1, Vol. II at 57–59. Agent Kirkham visited the Fullerton Lodge on January 30, 2015—located at 815 South Harbor Boulevard, Fullerton, California 92832—and confirmed that Mr. Thurman had checked into room 208 earlier that day. *Id.* at 56:22–24, 58:9–16; Tr. Ex. 30.

34. Mr. Thurman checked out of the Fullerton Lodge on the morning of January 31, 2015, and at the time of his arrest had not reserved a room for the night of January 31, 2015. Trial Tr. Day 1, Vol. II at 59:4–5, 64:11–14.

**Arrest and Post-Arrest Interview**

35. On the morning of January 31, 2015, Agent Kirkham texted defendant, posing as gjewels2, and informed Mr. Thurman that "she" was on her way, and asked defendant to order her a caramel macchiato drink. *Id.* at 53:4–6; Tr. Ex. 31 at 1.

36. Mr. Thurman informed gjewels2 that he was wearing a white shirt and blue shorts. Tr. Ex. 31 at 1.

37. Mr. Thurman ordered a caramel macchiato. Tr. Ex. 69.

38. Mr. Thurman texted gjewels2 and asked her to "[p]retend you are doing a bible study when you get in." Trial Tr. Day 1, Vol. II at 54:2–3.

39. Mr. Thurman was arrested shortly after ordering at Starbucks. At the time of his arrest, Mr. Thurman was carrying marijuana, condoms, a Bible, and a receipt showing his purchase of a caramel macchiato. *Id.* at 54:10–18.

40. At the time of his arrest, Mr. Thurman was wearing a white shirt and blue shorts. Trial Tr. Day 1, Vol. II at 55:15–22.

41. Mr. Thurman also had all of his belongings with him in a basket. This included a mobile phone and an SD digital storage card. *Id.* at 64–65.

42. During his post-arrest interview, Mr. Thurman stated that he had known gjewels2 was law enforcement while he was chatting with her on Mocospace. Gov't Ex. B at 10, 22; Ex. C at 1–3.

43. However, he also stated that when gjewels2 met him at Starbucks, he was going to tell her about his past and "try to set her on the right path." Gov't Ex. B at 10. He said that he "was going to . . . literally do a Bible study. I wasn't joking about that." *Id.*

44. Also during his post-arrest interview, Mr. Thurman made several statements about his whereabouts during the past eight years. First, Mr. Thurman stated that he had been in Orange County for the last eight years. *Id.* at 2. Then, he explained that he left Orange Country three times: once in August 2014 to spend a weekend in Klamath Falls, Oregon; once from December 7, 2013 to January 7, 2014 to visit North Carolina; and once at an undisclosed time to visit Antioch, California in Contra Costa County. Tr. Ex. 36; Gov't Ex. B at 2–4.

45. The parties stipulated that a CLEAR report for Mr. Thurman indicated that he received a traffic ticket in Contra Costa County on October 24, 2012. Tr. Ex. 111.

46. However, Mr. Thurman's bank records indicate that he made purchases and ATM withdrawals in Anaheim, California in late November 2012, early December 2012, and early January 2013. Tr. Exs. 73, 74.

## IV. CONCLUSIONS OF LAW

### Count One

47. Eighteen U.S.C. § 2244(b) makes it a criminal offense to use any means of interstate commerce to knowingly persuade, induce, entice, or coerce anyone under eighteen years of age to engage in illegal sexual activity.

48. The parties have stipulated that Mr. Thurman did use a facility and means of interstate and foreign commerce—namely, the Internet and telephone—to communicate with an undercover officer. Tr. Ex. 72.

49. Thus, the only elements at issue are whether Mr. Thurman: (1) knowingly attempted to persuade a person to engage in illegal sexual conduct, (2) believed the person he intended to persuade was a minor, and (3) took a substantial step towards committing the crime.

50. First, the Court finds beyond a reasonable doubt that Mr. Thurman knowingly attempted to persuade a person to engage in illegal sexual conduct. The transcript of Mr. Thurman's Mocospace chat with gjewels2 is almost entirely sexually explicit and makes clear that Mr. Thurman intended to persuade gjewels2 to engage in sexual conduct with him. Mr. Thurman was well aware that gjewels2 was fourteen years old, and was reminded of that fact several times during the chats.

51. Evidence presented at trial makes it clear beyond a reasonable doubt that Mr. Thurman knew this conduct would be illegal. In fact, he explicitly informed gjewels2 that the sexual activity in which they were planning to engage could result in Mr. Thurman going to jail.

52. Second, the Court finds beyond a reasonable doubt that Mr. Thurman believed that gjewels2 was a minor.

53. When a defendant has contacted an adult undercover office rather than an actual minor, the Ninth Circuit requires the defendant to have believed that he was targeting a minor in order for the defendant to be convicted under 18 U.S.C. § 2422(b). *United States v. Cherer*, 513 F.3d 1150, 1154 n.1 (9th Cir. 2008).

54. As explained above and described in the Findings of Fact, Mr. Thurman was told several times that gjewels2 was fourteen years old. In one instance, after gjewels2 explicitly referenced the age difference between the two, Mr. Thurman said "i know." Tr. Ex. 25 at 8.

55. There is no indication in the Mocospace chat transcript, or in the evidence before the Court, that Mr. Thurman believed he was speaking to anyone other than a fourteen-year-old girl. Mr. Thurman's alternative explanations—*i.e.* that he intended to conduct an actual Bible study, or that he realized from the beginning that gjewels2 was an undercover officer—are simply unconvincing.

56. Third, the Court finds beyond a reasonable doubt that Mr. Thurman took substantial steps toward violating 18 U.S.C. § 2244(b). Mr. Thurman arrived at the Starbucks where he agreed to meet gjewels2. He ordered the drink she requested. He was carrying the items he agreed to carry: marijuana and condoms. He was wearing the clothes that he told gjewels2 he would wear.

57. Accordingly, the Court finds Mr. Thurman GUILTY beyond a reasonable doubt of Count One: Attempt to Induce a Minor to Engage in Criminal Sexual Activity in violation of 18 U.S.C. § 2433(b).

**Venue**

58. Defendant argues that during its case-in-chief, the government did not establish by a preponderance of the evidence that the crimes charged in Counts 2 and 3 occurred in the Central District of California. Def. Br. at 9.

59. Mr. Thurman made a motion for judgment of acquittal at the end of the government's case-in-chief, and renewed the motion at the end of the trial. Trial Tr. Day 2, Vol. I at 19:11–21. The Court immediately reserved its decision on the motion pursuant to Federal Rule of Criminal Procedure 29(b). *Id.* at 29:2–16.

60. The Court must decide a Rule 29 motion on the basis of the evidence at the time the ruling was reserved. Fed. R. Crim. P. 29(b).

61. The government must prove venue is proper by a preponderance of the evidence. *See United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012). Thus, the government must show—in this case, on the basis of evidence presented in its case-in-chief—that it is more likely than not that Mr. Thurman was in the Central District of California on December 14, 2012.

62. In his post-arrest interview, Mr. Thurman stated that in the last eight years, he left Orange Country three times: once in August 2014 to spend a weekend in Klamath Falls, Oregon; once from December 7, 2013 to January 7, 2014 to visit North Carolina; and once, at an undisclosed date, to visit Antioch, California in Contra Costa County. Tr. Ex. 36; Gov't Ex. B at 2–4.

63. The Court finds that it is more likely than not that Mr. Thurman was in the Central District of California on December 14, 2012, because two of his three trips outside of Orange County were in 2014 and thus irrelevant, and there is no evidence that his third trip was during December 2012.

**Counts Two and Three**

64. Eighteen U.S.C. § 2252A(a)(2) makes it a crime to knowingly receive or distribute any child pornography that has been mailed or transported using any means of interstate commerce, including a computer.

65. The parties have stipulated that the images attached to the two emails discussed above depict minors engaged in sexually explicit conduct, and that the minors are real people. Tr. Ex. 72. *See* Tr. Ex. 1–22.

66. The parties have also stipulated that the images were shipped or transported in interstate or foreign commerce at or before the time of the acts alleged in the indictment (that is, the sending and receipt of these images). Tr. Ex. 72.

67. Thus, the only elements at issue are whether (1) Mr. Thurman knowingly received (Count 2) and distributed (Count 3) visual depictions of minors engaged in sexually explicit conduct; and (2) whether he knew that the visual depictions showed minors engaged in sexually explicit conduct.

68. Mr. Thurman admitted that he owned and controlled the jwatt92801@gmail.com account, and that he never willingly allowed anyone else access.
69. The images contained in Trial Exhibits 1 through 22 are clearly child pornography. Every child depicted in the images is prepubescent, including at least one infant.
70. If Mr. Thurman sent the email contained in Trial Exhibit 28 (from jwatt92801@gmail.com to rickyt111222@hotmail.com), he had to attach the images to the email himself. This would have required selecting which images to attach, which in turn would require knowledge of the content of the attached images.
71. The images contained in one of the emails—the email sent from rickyt111222@hotmail.com to jwatt92801@gmail.com—were contained in the body of the email, not attached as separate attachments. *See* Tr. Ex. 29. The content of the images in Trial Exhibit 29 would have been immediately apparent to a viewer of the email.
72. Although Mr. Thurman's phone has been stolen a number of times, there is no evidence in the record that his account has ever been used by anyone other than Mr. Thurman.
73. In addition, Mr. Thurman admitted that he knowingly received, stored, and distributed child pornography in other instances. Gov't Ex. A at 15, Ex. C at 9, 10, 11, 15, 16, 17.
74. The Court finds beyond a reasonable doubt that Mr. Thurman knowingly received the email contained Trial Exhibit 29 and distributed the email contained in Trial Exhibit 28, both of which contained images that Mr. Thurman knew were visual depictions of minors engaged in sexually explicit conduct.
75. Accordingly, the Court finds Mr. Thurman GUILTY beyond a reasonable doubt of Counts Two and Three: Distribution and Receipt of Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(2), (b)(1).

**V. CONCLUSION**

For the reasons explained above, and in light of all of the evidence presented at trial, the Court DENIES Defendant's Motion for Acquittal and FINDS Defendant James William Thurman Tanner GUILTY of Counts 1, 2, and 3.

DATED: August 9, 2017

*/s/ David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE